Now I'll call the case of Montye Benjamin v. Lynn Thomas. Good morning, Your Honors. Jamie Hall-Scott for Appellant Montye Benjamin. May it please the Court. We're here today on two very specific points. Now, motions for summary judgment are something this Court sees all the time. So here we're switching a little bit from the law. I'm not going to focus on the law. This Court is very well aware of what the requirements are for the granting or denial of a motion for summary judgment. So in this case we have to look at the facts, right? And there's, in our opinion, and I think it's justified based on the record evidence and both the filings here as the appellant and the appellee, that there is a genuine issue of material fact. In fact, the District Court addresses this on page 14 of their order. It says that the undisputed dashcam covers most of the facts. Well, that's the problem here with this dashcam. This dashcam isn't undisputed. In fact, there are multiple versions of this dashcam video that exist in the case. Now, the dashcam was shown both to Monty Benjamin and the family of the decedent, but also shown to a grand jury. Now, the grand jury version, it's the testimony of the sworn affidavits that this is different, that it's been edited, that the resolution is different, that it's skewed, that it cuts off the left side of the screen where we can see the penultimate facts of this case, which is the death of Mr. Benjamin. Can I ask you about it? Because I do think that's interesting. So, as I understand the affidavit of Stephen Benjamin, he says that when he went in the grand jury, on the screen, it looked like there were six versions of this video, and the person showing the video clicked on one of those. I mean, is it your idea that maybe there were six different video cams of this, or what was that? No, it's our good faith belief that there was one video that was cut in multiple different ways to draw attention to it, much like when we see a closed-circuit television camera, say, at a convenience store. They'll focus in on the cashier, and it gets grainier, and we see the resolution change. That's our position here. So the grand jury would be able to see this from multiple different aspects or maybe focus in on various different parts of the video, although there was one, in our belief, one stream of video, and that's how we've seen this in the various discussions with— So by the time the other cars got there, it was all over? Yes, it was. So there is just one, and you're— As far as we know, yes. One video that has been edited multiple times, and in fact, the possibility and the concept that there being six different videos shown up there shows that there are at least some different versions thereof. I had the good fortune— My understanding was that maybe if there were different—it doesn't seem like you've developed this at all evidentiary-wise, but my understanding was there may have been six different incidents recorded that day by a video camera, and that's a possible explanation. It was a grand jury looking at lots of things, not just your clients. It would be suppositional for me to say because I was not party to the grand jury, so I wasn't able to see that. My question to you is this is interesting, but what steps did you take to develop this evidence and discovery to actually give rise to a disputed issue of fact on this? My office during the discovery phase had been in contact with the state, with the district attorney's office, had gone through and discussed these issues. In fact, when we had reviewed with Ms. Benjamin and Mr. Benjamin the video that they had seen, immediately they said this is not right. This is not the video that we saw. Obviously, this is a traumatic experience. A mother watches her son be killed. You don't forget the little details. Every time you see it, it's burned into your brain, the slight details, the slight movements, the motions forward, the motions backwards, getting into the vehicle, getting out of the vehicle. These are things that are burned into her mind, and she was able to articulate to us very clearly and concisely the discrepancies between these videos. A lot of the video is, in fact, undisputed, but there are some facts, and the trial court acknowledges that. The district court says— What do you dispute about the video? We dispute probably about the last—we dispute part of the incident where Mr. Benjamin is getting in and out of the vehicle. The FLE says that the orders were consistent, stay in the vehicle, stay in the vehicle, stay in the vehicle. However, the record evidence and what we've supposed or put forth here is that it wasn't that. It was get out of the vehicle, stay in the vehicle. There's conflicting orders there during this time period. You're not saying the video that we see is inaccurate. No, the part that we see is not inaccurate. Just your inference from that is different. But what we saw, you're not saying any of that was like a different actor was put in? No, no. The video as it stands represents that portion of the video that we're actually able to see. Our contention is there's more to it. There's a larger video, one which shows the actions leading up to Mr. Benjamin's death at a very close point. When we look at whether or not it was a justified use of force, when we look at whether or not this was appropriate in the situation, we are forced to look at those last few seconds, right? Because these decisions come in those last few seconds. Just to follow up on Judge Carter's question, I mean, as I understand it, again, going back to Stephen Benjamin's affidavit, he says Officer Thomas placed his free hand on Javis' torso, still pointing his firearm, and appeared to give him a push. And Javis pulls away from Officer Thomas and tries to move away from him, trying to move past Officer Thomas. And so when I watched the video, I did not see that. So is that – that's the discrepancy? That's the discrepancy, Your Honor. That's the contention is that there's this portion on the left side of the video that doesn't show that. We don't actually see the final moments of Mr. Benjamin's life. And our contention is that this video is different from the one that was shown. We don't see the final minutes. They're out of camera range. But how do you respond to the fact that with seven, eight witnesses who consistently testified that Mr. Benjamin was the aggressor, that he was coming toward the officer, the officer was retreating to the point where he fell or was falling backwards, Mr. Benjamin was looking to be assaulting him or trying to assault him, but getting closer and closer to that gun, that is the undisputed testimony here. Well, the testimony of those eyewitnesses is unreliable from a standpoint of their distance from the incident. Some say Mr. Benjamin was three feet away to five feet away. The contention of the video is about six feet away when he was shot and he was actually retreating. We're not getting that last final piece from those eyewitness affidavits, the eyewitness testimony, saying that – But that is the undisputed evidence that we have. Would you agree if that's the undisputed evidence that the officer falling, being aggressively treated by this person, who seems to be quite angry and quite aggressive, that an officer in that position could reasonably fire a shot at that point? I don't believe so, Your Honor, because we have discussion in the appellee's response that Mr. Benjamin is trying to grab the officer as he gets out of the vehicle and take his firearm and all that. Why didn't the officer shoot then? The officer shows incredible restraint in all these other times, and then all of a sudden decides to shoot. It just doesn't add up with the facts of what are laid out in the affidavits. Let's put it this way. Let's put it this way. Undisputed facts are that – and you can say the officer is clearly in retreat. I mean, he's – the camera is moving. He's moving back, and Mr. Benjamin is moving toward him. You're right. The camera shuts off. The witnesses are uniform in saying that he was in retreat. Mr. Benjamin was the aggressor, looked to be ready to attack him. The gun was out. Mr. Benjamin is 20 years, 30 years younger, a lot bigger. What do you think the officer should have done in that case? What should he have done? He's falling. Somebody's attacking him. He's afraid he's going to grab the gun. What do you say a reasonable officer should do? Well, I don't wholesale accept those facts because I don't believe – I ask you accept the facts. If you accept the facts, what do you think an officer should do? I don't think those are the facts of this case. If those were the facts of this case – Well, you answered my question. Yes, Your Honor. If those were the facts of this case, then I think that the officer would have had to make a split-second decision. I'm not a police officer for that very same reason. I can't – and I can't second-guess it, neither can the courts. We have to look at what the officer thought at that time period. Now, what the officer thought at that time period would have to be reflected in that video, the video which is missing. And that's the key component here. Well, what is your alternate – that's their facts. What are your alternate facts that you think we should be considering then? That off the video, that Mr. Benjamin moved away from the officer, moved off to his side, and started to walk away. That is our alternative version of these facts. One that we believe in good faith was shown by the video. And you say we just have to totally discount the eight witnesses then? No, I think the eight witnesses go up to the point of the video ending as well. The eight witnesses don't fully articulate those final few seconds. And it's almost scary that so many witnesses from so many different perspectives so far away could have such a similar view of things when we ourselves, looking at a video from one point of view over and over and over, can't come to that. So I think we have to look at that with a grain of salt that these witnesses may not have actually seen exactly what they believe that they have seen here. And also that those last few seconds were something that they could not have seen. Thank you. Thank you. You've saved some time for rebuttal, so we'll hear back from you. Good morning. May it please the Court. My name is Carrie Ware, and along with my co-counsel Bob Wilson and Stephen Quinn, we represent Sergeant Lynn Thomas, or Chief Lynn Thomas, of the Avondale Estates Police Department. He's here today. Chief Thomas at the time of this event was a sergeant, and so we are going to—I will refer to him as sergeant throughout my discussion. Contrary to— You understand there to be a single video as well. There's not more than one. That's correct. There is only one video. Can I ask you about that? So in your response to— Let's see. There's some filing that you made in district court, and I'm not sure. I think it's at Docket Entry 34. You say something about you tried to get the video from the GBI, but the agency wouldn't give it to you. Correct. Now, I will say this just to be forthright. Judge Duffy did not consider that evidence because he said we didn't follow the district court local rules, so we did not consider that, but in answer to your question— And you say something like they simply reflect a different aspect ratio. That's what you say in your pleading. So the video that had different traffic stops on it, the one at issue here is the one involving Mr. Benjamin. The other traffic stops were related to other individuals. So when you say they reflect different aspect ratios, you're talking about completely different traffic stops. You're not talking about this one. Well, this video was—the one that the GBI has was the original disc taken out of the car, the police car. They are not going to release that to me as an attorney, but they did give an affidavit confirming that the video that was given to Avondale Estates and that we submitted in this case is the same video that they have. Yeah, I got that. What do you mean when you say they simply reflect a different aspect ratio? That on some computers, you're going to see the image, the black sides, as opposed to it filling up the whole screen. That different computers are going to show that image wider or narrower, but it does not change the image that's being seen. It doesn't cut off any part of the image. I'm sorry, but this is my one chance to kind of try to get to the bottom of this. In your view, Stephen Benjamin says that he saw a video that showed Officer Thomas placing his free hand on Javis' torso, pointing the firearm, and give him a push. Do you say never was on the video? You never saw that on the video? That is not on the video, and I am not saying that Mr. Stephen Benjamin or Mrs. Monty Benjamin are not telling the truth. Oh, no, I wasn't implying that. I just was trying to—what is the dispute? Right, the dispute is that that is not what occurred and that has not ever been on the video, that the video that has been submitted as the dash cam video is the only video that has ever existed. And you've seen it, and that's the one that's in the record? Correct. Okay. And I will also point out that the dash cam video we submitted, although Mr. Benjamin and Sergeant Thomas do leave the frame for the last few seconds, the audio continues, and you can hear the struggle in the audio, which is consistent with Sergeant Thomas' testimony that there was a struggle and also consistent with seven of the eight eyewitnesses who said that there was a struggle or there was contact between Mr. Benjamin and Sergeant Thomas. And the one eyewitness that said she didn't see the struggle said that she had looked away to grab her cell phone. And so in order to believe there is this alternate video, then the district court and this court would have to believe that there has been this conspiracy among the GBI, the Avondale Estates Police, the district attorney's office, and these eight eyewitnesses. And I will respectfully disagree with what my colleague said, that the eight eyewitnesses don't tell us what happened off the camera. Those witnesses tell us moment by moment up until the shot was fired. In fact, several of them described the shot and that they were fearful at that moment that Sergeant Thomas was going to be overcome by Mr. Benjamin. And their description is of exactly what was happening even off the camera. Is there anywhere—I mean, you said Sergeant Thomas is here today. I mean, is there anywhere in the record that gives his size and weight— I mean, we have the size and height and weight of Mr. Benjamin, but I mean, is Sergeant Thomas' weight and height in the record? I am not aware that the specific height and weight are in the record. I do know we make the statement that there was a significant disparity between his height and weight and that of Mr. Benjamin, and I believe that's also in some of the witness affidavits, that there was a size difference between Sergeant Thomas and Mr. Benjamin. So I would submit that this case is not a case on summary judgment where there are disputed facts, and therefore they have to be interpreted in favor of the nonmovement. As the Supreme Court told us in Scott v. Harris, and this court recently again recognized in Shaw v. City of Selma, this is a case where there is a video of what has occurred, and that video is undisputed. And despite the fact that my colleague says that the video is in the case, there is no other video in the case. What has been submitted are affidavits that describe this video, and this video has not been submitted. In fact, there's been no testimony or evidence that the plaintiff even sought this video. Frankly, this is the first time I've heard today about Mr. Houscott's efforts to obtain the video from the DA. That was not in the record. There is nothing in the record where they made an Open Records Act request or they never asked Judge Duffy to issue an order to get this alleged video. So that video does not exist in the record. What we have is affidavits, and I submit those violate the best evidence rule. They contain rank hearsay. They're describing what the DA has said in a confidential green jury proceeding and what green jury members have said. And that can't be reduced to an admissible form of testimony at trial because the DA and the green jury members can't testify about a confidential green jury proceeding. And so these affidavits are not even admissible and should not be considered, and Judge Duffy recognized that implicitly in footnote 11 of his order. He notes that the plaintiff tries to cast doubt on the events that occurred in the seconds after Sergeant Tommins and Mr. Benjamin leave the frame, and he goes on to articulate that he does not find it to be credible or evidence that is any facts that are substantiated. It's not your understanding that Judge Duffy excluded any of their evidence, is it? He did not explicitly make a ruling that those affidavits were excluded. However, at footnote 11 of his order, as I stated, he does acknowledge that plaintiff attempts to cast doubt on the events taking place after defendant and Mr. Benjamin disappear from the view of defendant's dash cam. Then he refers to the audio version of the dash cam video that is consistent with the eyewitness statements that there was a struggle, and he states that the plaintiff's claim that Mr. Benjamin was retreating from the defendant is simply without merit or substantiating facts. So if he did not— He didn't exclude—I mean, he was weighing the evidence. He looked at it, but at the end of the day, those affidavits contain inadmissible testimony, and there is no evidence in the case that the dash cam video was altered. There is no expert testimony from anyone to indicate that the dash cam video has been altered in any way, and I also would note that that dash cam video was in the hands of plaintiff's counsel from the very inception of the case. It was turned over with initial disclosures. Actually, even before we sent a letter, but in initial disclosures. And so— I mean, we don't second guess what police officers do. I mean, we have a lot of police officers that help us around the courthouse, and we appreciate them, and we don't— we understand that they live with a lot of stress and danger, but, you know, I mean, my kind of question about this or wish about this case is that there had been— I mean, I just—so there's a traffic violation with a 20-year-old person, and that person ends up dead. I mean, Sergeant Thomas doesn't ever indicate that he believed Mr. Benjamin was armed. So, you know, it's not for the courts to do, but, you know, if there's some protocol to use less than deadly force, I just think we'd all be better off. Well, I would like to address that, Your Honor, because Sergeant Thomas— well, we just start from what this court and the Supreme Court have said. I know. I just said we don't second guess what police officers do. But in this situation, I submit that he did actually pursue every single avenue possible to try to defuse the situation. As soon as he got out of his car, he began issuing warnings, stay in the car, stay in the car. He already had his gun in his hand when he got out of the car. He was checking his holster to make sure his gun was there and it was unlatched. When he approaches the car, he does not have his gun out, and he, at some point while he's standing there, he does take it out as Mr. Benjamin is coming out of the driver's side window in violation of Sergeant Thomas's numerous orders, stay in the car, stay in the car. You know, I listened to that, and, you know, it's obviously a fraught situation and emotions are high all the way around. And it was—I mean, it was not clear to me that he was consistently saying— the words he was using was, do not get out of the car. But I thought at some point he was saying, get out of the car. Well, I mean, I looked at it a couple of times. Well, Your Honor, I will say that all eight witnesses, except the one who couldn't hear what was being said, so seven of the eight, indicate they understood what he was saying. I think that the video is pretty clear. He was saying, stay in the car, stay in the car, do not get out of the car. When he climbs out, he says, stop, get back in the car, get down. I mean, he's giving warnings, but as he—and as he's giving these warnings, after Mr. Benjamin gets out of the car, the officer is backing up. He's retreating. He's holding his gun out at that point, but he's retreating. He's trying to give Mr. Benjamin every opportunity possible to stop. And, you know, he could have, I guess, shot when he first approached the car. That was what my colleague suggested he could have done, but he didn't, because he wanted to diffuse the situation, and he's backing up, retreat, retreat, giving warnings until Mr. Benjamin continues to pursue and is on top of him and the officer is on his back. And so—and the cases are very clear that officers are not required to wait until the very last second and just hope for the best, but that they can defend themselves and others. And in this situation, Officer Thomas's using deadly force was his last resort, because if Mr. Benjamin—he didn't know whether Mr. Benjamin had a weapon. That is the facts in the case. He didn't see one, but there is no evidence that he didn't have one either. Well, we found out after the fact that he did not have one, but in the situation, which is what we're looking at this from, Sergeant Thomas didn't know whether he had a weapon or not, but he was being attacked. And so whether it was an attack with Mr. Benjamin's physical body or with a gun, he's entitled to defend himself and had to defend himself. So we submit that this case is not one that there are diversions in the facts. The undisputed evidence is clear. There is a dash cam video and eight eyewitnesses to this. And under Scott v. Harris, that video is to be believed. And we ask that this court affirm the grant of summary judgment to Sergeant Thomas. Thank you. Thank you. Thank you. Thank you, Your Honors, if I may. So Appellee's Counsel raised a lot of different issues here. We hear claims of a conspiracy. Well, they said themselves that they couldn't get the original copy of this video from the GBI. On one hand, they want to say that our affidavits are an admissible hearsay, but they're perfectly fine with affidavits of the GBI saying that this is the version of the video they have, even though they've admitted the GBI wouldn't give them the original video. So we've got some conflicts there. Now they say, why would the DA and the police and the state conspire on this? Remember, this isn't Sergeant Thomas now. This is Chief Thomas now. The politics that come into holding a high office as a police officer, I know I have many friends that are in law enforcement, including the chief and the sheriff in Orange County in Orlando where I'm from. Testifying now in a rather pejorative way, I might add. I'm sorry, Your Honor. We understand that there's politics involved with this. Do you have any evidence for this assertion, that there's politics involved and that anybody was trying to hide a videotape? There is not an assertion at this instance. It's a generalized assertion that holding a political office comes with political pressures, comes with concerns of that. I'm not going to say there's a conspiracy. I would not say that here. Now, Your Honor, you seized on the concept of an aspect ratio. This is incredibly important. This is a term of art. Yes. This is incredibly important when we look at an aspect ratio. Just like your TV being a 4.3 or a 16x9, when you watch those shows on TV and it crops it down, it's cutting off pieces of information. It's cutting off parts on the side. That's the difference there. We can't rebut this because we can't get the original video. And this is Appellee's assertion, that they couldn't even get the original video, only having to rely here on affidavits. And this is kind of like earlier, Your Honor, when you spoke about this kind of adding insult to injury where the prior OA this morning wasn't allowed to amend their complaint, and then Appellee said, well, because they couldn't amend their complaint, they found themselves in this situation. And that's where we're finding ourselves here with this. We're being told we don't have the video. We can't produce a different version of the video. We can't put the affidavits in, even though there was no exclusionary ruling by the district court. We don't have this video. We can't get the video. And because we can't get the video, then we can't use affidavits to prove this video that we couldn't get that they couldn't even get. So this is a really difficult position to find yourselves in. And we're really looking to get to the bottom of this. And those are the facts that are in dispute here. And those are material facts. If we look at best evidence and we're being told that this is not the best evidence, that's what the filing said by the Appellee, that this is not the best evidence, but they neglect that if they're the ones who are in charge of the evidence or they couldn't get the evidence, then you have to go with what is left. And in this case for us, that is an affidavit. And, again, the court did not exclude any kind of affidavit evidence in this case. The Appellee also says that the officer didn't know. Sergeant Thomas didn't know there was a weapon. Of course he did. We have undisputed dash cam video. Javis's hands are up in the air screaming, You all see what they're trying to do to me. This appears in both of our briefs. You all see what they're trying to do to me. His hands are up. His hands never go in his pocket. There's never any dispute about whether his hands go in his pocket. There's no weapon. There's no objective reason to believe that there is a weapon. And these are undisputed facts there. The district court simply weighed the evidence here. Instead of allowing this to go to the jury, the district court said, I've looked at this evidence and I've weighed it. Once again, the evidence is undisputed that there are eight witnesses, seven of whom say that your client, the deceased, was the aggressor. He outweighed the person. He was on attack and that they thought the officer was going to be seriously hurt. That's the undisputed evidence. The evidence that is undisputed is not the entire evidence. It is not the What would be the other evidence other than these eight folks? What other evidence? The affidavits in support of the complete video, which this court has heard, nobody's been able to get. The GBI has the video, and we just have to take their word for it in their affidavit that that's the complete video. Although, APLE says aspect ratio. Aspect ratio is a term of art. The video has been edited. It is very clear. The resolution is different, and we need to get to the bottom of it to get this in order for this to move forward. But those affidavits critically set up this disputed issue of material fact. Thank you. Thank you, Your Honor. That concludes our court proceedings for the morning. Thank you for the presentation, and we are in recess.